UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CAESARS ENTERTAINMENT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>IUOE LOCAL 68 PENSION FUND,<br><br>Defendant. | No. 2:17-cv-2450-KM-MAH<br><br>OPINION |

**MCNULTY, U.S.D.J.:**

This matter concerns partial-withdrawal liability under the Employee Retirement Income Security Act of 1974 ("ERISA") and Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). Showboat Atlantic Operating Company, d/b/a Showboat Atlantic City ("Showboat"), is associated with several other companies, which are together referred to as "CEC" or the "CEC Controlled Group." The employees of the companies in the CEC Controlled Group, including Showboat, were covered by a multiemployer plan, the IUOE Local 68 Operating Engineers Pension Fund ("Local 68 Pension Fund" or "the Fund"). Pursuant to their respective collective bargaining agreements ("CBA"), Showboat and the other employers in the CEC Controlled Group made contributions to the Fund. Showboat closed on August 31, 2014 and ceased to make contributions to the Fund under its CBA. The remaining companies in the CEC Controlled Group, and their CBAs with their represented employees, were unaffected. As to the employers other than Showboat, then, the contributions to the Fund continued uninterrupted.

The withdrawal provisions of ERISA may impose liability on an employer who withdraws or partially withdraws from a multiemployer plan. The intent is

1

to ensure that the employees' pensions are adequately funded, and to avoid a race for the exits by other employers in the plan, who would otherwise fear being left behind with the entire pension liability. Thus an employer may incur liability when, by terminating or shifting some of its operations, it partially withdraws from a multiemployer pension plan.

There is one per se rule: A partial withdrawal occurs when the decline in contributions totals at least 70%. That, as all agree, did not occur as a result of the Showboat closing.

A partial withdrawal may nevertheless be found, however, if certain alternative conditions are met. The employer (or group) may be liable to pay into the fund if the employees' work, or similar work, is still carried on, but is no longer covered by a plan that requires the employer to contribute. A common scenario might be a transfer of previously covered work to a nonunionized plant.

Some work covered by the Fund, as well as the associated contributions, surely ceased as a result of the closing of the Showboat casino. I cannot find, however, that the same work or similar work was carried on, whether at the Showboat facility or anywhere else, by noncovered employees. I will therefore reverse an arbitrator's award holding the CEC Controlled Group liable for partial withdrawal contributions.

## I. BACKGROUND[1]

### A. The CEC Controlled Group

Showboat formerly operated in Atlantic City. (SMUF ¶ 1). It closed on August 31, 2014. (SMUF ¶ 1). Showboat was associated with a group of companies referred to here as the "CEC Controlled Group."

On or about August 31, 2014, Caesars Entertainment Corporation ("CEC") controlled more than 80 percent of the voting shares of Caesars Entertainment Resort Properties, Inc. ("CERP") and Caesars Entertainment Operating Company, Inc. ("CEOC"). (SMUF ¶¶ 4-5, 14).

At this time, CEOC also owned Bally's Park Place, Inc. d/b/a Bally's Hotel and Casino ("Bally's AC"); Boardwalk Regency Corporation d/b/a Caesars Atlantic City ("Caesars AC"); and Showboat (SMUF ¶¶ 6-8). CEOC controlled more than 80 percent of all voting stock in those companies. (SMUF ¶ 15).

CERP owned Harrah's Operating Company, Inc. d/b/a Harrah's Atlantic City Casino and Hotel ("Harrah's AC"). (SMUF ¶ 8). CERP controlled more than 80 percent of all voting stock in Harrah's AC. (SMUF ¶ 16).

Based on these relationships, it is undisputed that CEC, CEOC, Showboat, Bally's AC, Caesars AC, and Harrah's AC constitute the same "controlled group" (the "CEC Controlled Group") and are treated as a single employer under ERISA § 4001(b)(1), 29 U.S.C. § 1301(b)(1).

---

[1] Pursuant to L. Civ. R. 56.1, CEC submitted a statement of material facts believed to be undisputed. This statement significantly relies on the parties' joint stipulation of facts submitted during arbitration. (See ECF No. 17-23). Local 68 Pension Fund's statement of facts in their brief largely matched CEC's statement. (See ECF No. 16). The Fund does not raise any genuine issue that is truly material to the claims here.

Citations to the Statement of Material Undisputed Facts (ECF No. 17-2) are abbreviated as "SMUF."

3

## B. The Fund and the Collective Bargaining Agreements

Each member employer of the CEC Controlled Group has a separate collective bargaining agreement ("CBA") with the International Union of Operating Engineers. (SMUF ¶ 18). Each CBA has a separate and distinct term and contribution rate. (SMUF ¶¶ 24-25). Each CEC Controlled Group CBA covers a group of pension fund participants. These groups of pension fund participants are separate and distinct. (SMUF ¶ 26).[2]

Showboat contributed to the Local 68 Pension Fund, as required by the Showboat CBA that was in effect from May 1, 2011 through April 30, 2014. (SMUF ¶ 19). Showboat's contributions to the Fund continued until August 31, 2014, when the casino closed and the Showboat CBA terminated. (SMUF ¶ 20).

Caesars AC, Bally's AC, and Harrah's AC had separate CBAs, which were effective from May 1, 2014 through April 30, 2017. As required by their CBAs, these three employers separately contributed to the Fund during the same period that Showboat was contributing (*i.e.*, before August 31, 2014). (SMUF ¶¶ 21-23). Their obligations were not affected by the Showboat closure; after August 31, 2014, each of them continued to contribute to the Fund. (SMUF ¶¶ 21-23).

Since Showboat's closure, CEC's remaining constituents (Caesars AC, Bally's AC, and Harrah's AC) have continued to contribute substantial amounts to the Local 68 Pension Fund. Those contributions were as follows:

- $390,683.17 from September 1, 2014 through December 31, 2014
- $1,065,493.01 from January 1, 2015 through December 31, 2015
- $794,826.12 from January 1, 2016 through September 30, 2016
- $286,285.37 from October 1, 2016 through December 31, 2016
- $740,532.14 from January 1, 2017 through August 31, 2017.

---

[2] There may be some overlap, presumably minor, to the extent a participant may perform a covered service for more than one of the entities in the CEC Controlled Group. (SMUF ¶ 26).

4

(SMUF ¶ 27). Adding these post-Showboat-closure contributions by CEC yields a total of $3,277,819.81.

Showboat's closure did not cause a decline in the CEC Controlled Group's contributions to the Fund that amounted to 70% (a threshold of statutory significance, see infra). (SMUF ¶ 28). Rather, Showboat's closure resulted in a much smaller decline in CEC contributions, amounting to approximately 17%. (SMUF ¶ 28).

### C. Dispute, Arbitration, and Appeal to this Court

Disputes regarding withdrawal liability from multiemployer pension plans follow a four-step process:

> [1] The plan sponsor has the responsibility of determining this withdrawal liability, notifying the employer, and collecting payment. 29 U.S.C. § 1382. [2] If the employer disputes the amount set, it may ask the plan sponsor to conduct a reasonable review of the computed liability. 29 U.S.C. § 1399(b)(2)(A). [3] In the event the dispute is unresolved, either party may request arbitration. 29 U.S.C. § 1401(a)(1). [4] The arbitrator's award, in turn, may be challenged in federal court. 29 U.S.C. § 1401(b)(2).

*Galgay v. Beaverbrook Coal Co.*, 105 F.3d 137, 138-39 (3d Cir. 1997) ([bracketed] numbers added). The dispute now before the Court followed that pattern.

On March 11, 2016, Local 68 Pension Fund assessed CEC for complete withdrawal liability. (SMUF ¶ 29). The Fund initially asserted that CEC and its members were jointly and severally liable for complete withdrawal. CEC disagreed. (SMUF ¶ 30).

In a letter dated July 13, 2016, CEC submitted its demand for arbitration. (SMUF ¶ 31). CEC argued that it was not liable for complete withdrawal liability because its members continued to contribute to the Fund. (SMUF ¶ 31).

During the arbitration, the Fund raised an alternative argument that partial—rather than complete—withdrawal liability should be assessed against

5

CEC. (SMUF ¶ 32). The arbitrator, the Fund, and CEC agreed that the issue of partial withdrawal liability could be reviewed in the arbitration. (SMUF ¶ 33).

On December 23, 2016, CEC submitted its memorandum to the arbitrator, moving for the equivalent of summary judgment. The memo addressed both complete and partial withdrawal liability. (SMUF ¶ 34). On January 19, 2017, Local 68 Pension Fund submitted a brief in opposition. (SMUF ¶ 35). At this time, the Fund abandoned its argument for complete withdrawal liability, and argued solely for partial withdrawal liability. (SMUF ¶ 35). On January 27, 2017, CEC submitted a reply in support of its motion for summary judgment. (SUMF ¶ 36).

On February 27, 2017, arbitrator Norman Brand submitted an interim award and opinion upholding the Fund's partial withdrawal liability assessment against CEC. (SUMF ¶ 37). The arbitrator found that CEC "permanently cease[d] to have an obligation to contribute [to the Fund] under .... Fewer than all collective bargaining agreements under which ... [it] ... has been obligated to contribute...." (ECF No. 17-2, p.13). The arbitrator also found that CEC continued to perform "work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required ...." (ECF No. 17-2, p. 13). Thus, the arbitrator held that not a total but a "partial cessation" occurred under ERISA § 4205(b)(2)(A)(i), 29 U.S.C. § 1385(b)(2)(A)(i).

On March 7, 2017, CEC requested that the arbitrator reconsider or amend the interim award and opinion. (SUMF ¶ 38). The arbitrator largely rejected the request for reconsideration; he slightly modified the award but upheld the finding of partial withdrawal liability. (SUMF ¶ 39).

On April 10, 2017, CEC filed a complaint in the District of New Jersey, asking this court to vacate the arbitration award. (ECF No. 1). On April 24, 2017, Local 68 Pension Fund filed its answer. (SUMF ¶ 41).

Meanwhile, pursuant to federal regulations, CEC has made interim withdrawal liability payments on November 7, 2016, March 20, 2016, April 25,

2016, and July 25, 2017. (SUMF ¶ 42). Each of these four payments was in the amount of $95,334.50, for a total of $381,338.00. (SUMF ¶ 42).

CEC asserts that the arbitrator erred. The closure of Showboat and the termination of Showboat's CBA, it says, did not constitute a withdrawal from the Fund because the remaining CEC entities continued to contribute to the Fund. (SMUF ¶ 3). CEC requests that this court vacate the amended interim award and opinion of the arbitrator; order the return of interim payments under 29 C.F.R. § 4219.18(e); and award attorneys' fees.

Local 68 Pension Fund disagrees. The Fund maintains that the CEC Controlled Group is responsible for Showboat's partial withdrawal liability, and requests that this court affirm the arbitration award.

## II. STANDARD OF REVIEW OF ERISA ARBITRATION AWARD

A district court hearing a challenge, like this one, to an arbitrator's ERISA award must apply different standards of review to legal conclusions, factual findings, or mixed questions of law and fact. *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346, 349-50 (7th Cir. 2012); *see also Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. BES Servs., Inc.*, 469 F.3d 369, 375 (4th Cir. 2006).

As to factual findings, the district court must apply a deferential clearly-erroneous standard of review. A court must presume that an arbitrator's factual findings are correct, a presumption that is "rebuttable only by a clear preponderance of the evidence." ERISA § 4221(c), 29 U.S.C. § 1401(c). Thus factual findings will therefore be reversed only if "clearly erroneous." *Crown Cork & Seal Co. v. Cent. States Se. & Sw. Areas Pension Fund*, 982 F.2d 857, 860 (3d Cir. 1992). As to an arbitrator's legal conclusions, ERISA does not specify the applicable standard of review. The United States Court of Appeals for the Third Circuit, however, long ago settled that legal conclusions must be reviewed de novo. *Crown Cork & Seal Co.*, 982 F.2d at 860. As to mixed questions of law and fact, a district court must employ a mixed standard of review: it applies "a clearly erroneous standard to findings of fact and

7

conduct[s] plenary review of conclusions of law, applying the appropriate standard to each component." *Id.* at 861 (citing *In re Sharon Steel Corp.*, 871 F.2d 1217, 1222 (3d Cir. 1989)).[3]

To determine the appropriate standard of review, then, I must determine whether the arbitrator's determination that a "partial cessation" occurred presents a legal, a factual, or a mixed issue. Because the arbitrator's determination involved the application of the ERISA statute to largely undisputed facts, I find that it presents a mixed question of law and fact.

> [Mixed questions of law and fact are] questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.

*Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982). Here, the underlying facts were largely conceded by both sides. Rather, the parties dispute whether the law, properly applied to the facts, gives rise to partial-withdrawal liability. Therefore, I will apply a "clearly erroneous" standard to the findings of fact and review conclusions of law de novo. *See Crown Cork & Seal Co.*, 982 F.2d at 861 (citing *In re Sharon Steel Corp.*, 871 F.2d at 1222).

### III. PARTIAL WITHDRAWAL UNDER ERISA

#### A. Withdrawal generally

ERISA establishes minimum standards and other rules for private-industry pension plans. ERISA § 2 *et seq.*, 29 U.S.C. § 1001 *et seq.* It aims to ensure that employees and their beneficiaries are not "deprived of anticipated retirement benefits by termination of pension plans before sufficient funds have been accumulated in the plans." *See Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984). Congress wanted to

---

3     The Local 68 Pension Fund incorrectly argues that the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, provides the standard of review of the arbitration award. Statutes specific to ERISA and the MPPAA, as well as Third Circuit precedent, clarify that district courts do not apply the FAA's standard of review in such circumstances.

8

guarantee that "if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 375 (1980).

The Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1381 *et seq.*, ("MPPAA") requires an employer withdrawing from a multiemployer pension plan to pay for any incurred withdrawal liability. *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 609 (1993) (citing *R.A. Gray & Co.*, 467 U.S. at 725). The MPPAA was enacted "out of a concern that ERISA did not adequately protect multiemployer pension plans from the adverse consequences that result when individual employers terminate their participation or withdraw." *SUPERVALU, Inc. v. Bd. of Trustees of Sw. Pa. & W. Md. Area Teamsters & Employers Pension Fund*, 500 F.3d 334, 336 (3d Cir. 2007) (internal citation omitted). It was "designed to prevent employers from withdrawing from a multiemployer pension plan without paying their share of unfunded, vested benefit liability, thereby threatening the solvency of such plans." *Id.* Accordingly, a withdrawing employer must pay its share of the plan's unfunded liability to "insure[] that the financial burden will not be shifted to the remaining employers." *Id.* at 337.

An employer "withdraws" from a multiemployer pension plan when the employer "either permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plans." *Galgay*, 105 F.3d at 138-39 (citing ERISA § 4203(a), 29 U.S.C. § 1383(a)). The withdrawing employer is liable for its share of the unfunded vested payments, calculated as of the time of withdrawal. *Id.* (citing ERISA §§ 4201, 4203, 4211, 29 U.S.C. §§ 1381, 1383, 1391; *Concrete Pipe*, 508 U.S. at 609).

A discussion of complete withdrawal from the Fund is necessary as background, but is not the issue here. Before the arbitrator, the Fund abandoned its initial claim of complete withdrawal.

### B. Partial Withdrawal: The issue on this appeal

A liability-creating withdrawal, however, need not be total; it may be partial. ERISA specifically addresses such a partial withdrawal, *i.e.*, a situation in which "the employer permanently ceases to have an obligation to contribute under *one or more but fewer than all collective bargaining agreements* under which the employer has been obligated to contribute under the plan . . . ." ERISA § 4205(b)(2)(A)(i), 29 U.S.C. § 1385(b)(2)(A) (emphasis added).

The parties agree that the issue here is partial, not complete, withdrawal. The termination of the Showboat CBA ceased the CEC Controlled Group's obligations under "one . . . but fewer than all" of the relevant CBAs. *Id.* That is, contribution obligations ceased under the Showboat CBA, but continued under the other CBAs (Harrah's AC, Bally's AC, and Caesars AC). For purposes of the remainder of the discussion, then, a "cessation" or "withdrawal" means a *partial* cessation or withdrawal, with respect to the Showboat CBA only.

I summarize the ERISA standards under which a liability-creating partial withdrawal may be found.

The first such partial-withdrawal standard is an easily-applied, *per se* rule, but it does not apply to the facts of this case. "[T]here is a partial withdrawal by an employer from a plan" if "on the last day of a plan year" (1) "there is a 70-percent contribution decline . . . ." ERISA § 4205(a)(2), 29 U.S.C. § 1385(a)(2). The parties before the arbitrator agreed that there was not a 70% contribution decline as a result of the Showboat closing. Rather, the decline amounted to approximately 17%. (SMUF ¶ 28). I therefore set aside the 70% rule for the remainder of this Opinion.

Where the 70% rule does not apply, the parties are thrown back on a second, more fact-specific alternative standard: A partial withdrawal will be found where "there is a partial cessation of the employer's contribution obligation." ERISA § 4205(a)(2), 29 U.S.C. § 1385(a)(2). The arbitrator here found that there had been such a "partial cessation" (ECF no. 17-2), and that is the issue on appeal.

10

"Partial cessation" is a term of art. By statute, a partial cessation of the employer's contribution obligation for the plan year occurs if, during such year,

> (i) the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or transfers such work to another location or to an entity or entities owned or controlled by the employer, or
>
> (ii) an employer permanently ceases to have an obligation to contribute under the plan with respect to work performed at one or more but fewer than all of its facilities, but continues to perform work at the facility of the type for which the obligation to contribute ceased.

ERISA § 4205(b)(2)(A)(i)-(ii), 29 U.S.C. § 1385(b)(2)(A)(i)-(ii).[4] I will call these subsections "Alternative **(i)**" and Alternative **(ii)**."

As stated above, it is undisputed that the CEC group ceased to have an obligation to contribute under one of its several CBAs, or at one of its several facilities. *See id.* More than just termination of one contribution obligation is required, however, before an employer will incur partial-withdrawal liability. The statute also requires that the formerly covered work be "continu[ed]" or "transfer[red]" in a particular way. *Id.* The two kinds of continuation or transfer that will create liability under subsections A(i) and A(ii), quoted immediately above, have been given the following shorthand designations:

> Alternative **(i)**: a "bargaining out" or
>
> Alternative **(ii)**: a "facility-take-out"

In the remainder of the Opinion, I will refer to them as such.

---

[4] A partial cessation does not occur under this provision solely because, with respect to the same plan, one agreement that requires contributions to the plan has been substituted for another agreement that requires contributions. ERISA § 4205(b)(2)(B), 29 U.S.C. § 1385(b)(2)(B). That did not occur in this case; one CBA has not been replaced by another CBA.

11

The **(i)** "bargaining out" and **(ii)** "facility-take-out" concepts, though distinct, are interrelated:

> The bargaining-out situation occurs where . . . the employer continues to perform work "in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or transfers such work to another location." [quoting ERISA § 4205(b)(2)(A)(i), 29 U.S.C. § 1385(b)(2)(A)(i)] This commonly occurs as a result of a change in union representation or if the employer bargains out of an obligation to contribute to the plan. For purposes of the bargaining-out provision, the Seventh Circuit held that union work was "transferred" to another location when two shipping terminals closed and the union drivers covered by the fund were dismissed, but some of the work previously performed by these union drivers remained and was assigned to nonunion workers.
>
> The facility-take-out type of partial withdrawal occurs when an employer has an obligation to contribute for more than one geographic location and ceases contributions at one of them but "continues to perform work at the facility of the type for which the obligation to contribute ceased."
>
> In a facility-take-out situation, Section 4205(a)(2) specifies that a partial withdrawal can occur only where the employer continues to perform the type of work for which contributions would be required. In other words, a partial withdrawal does not occur under this section solely because an employer ceases or terminates one or several operations ... [unless it led to a 70% decline in contributions]. In a bargaining-out situation, Section 4205(b)(2) provides that a partial withdrawal can occur not only where the union work is transferred to another location of the employer but also where the work is transferred to another entity or entities owned or controlled by the employer.

ABA Section of Labor & Employment Law, Multiemployer Plan Withdrawal Liability, *Employee Benefits Law* 17-22–23 (4th ed. 2017) (footnotes omitted).

## IV. DISCUSSION

### A. Alternative (i) ("bargaining out")

Alternative (i), a "bargaining out," is not established by the record before the arbitrator.

Alternative (i) applies where work that was within the scope of the terminated CBA continues to be performed, but now no longer requires the employer to contribute to the pension fund. See ERISA § 4205(b)(2)(A)(i), 29 U.S.C. § 1385(b)(2)(A)(i). The cessation of the employer's obligation to contribute may occur because the employer transferred the work to another location, or to another entity that it controls. It can occur as the result of bargaining. See ABA, *Employee Benefits Law* 17-22–23, *supra*. The key, however, is that the same work, or kind of work, continues to be performed in a setting where it is no longer covered by a plan that requires the employer to contribute.

As to Alternative (i), the Pension Benefit Guaranty Corporation ("PBGC") has given authoritative guidance. For this provision to apply, "the work that the employer continues to perform must be work for which contributions are not required under the plan." See Pension Benefit Guaranty Corporation 83-20, 1983 WL 22426, at *1. In support, the PBGC guidance cites the contemporaneous explanation of Congressman Thompson, the floor manager for the multiemployer amendments:

> It is important to emphasize and to understand that in no case do these rules impose liability on an employer for merely ceasing or terminating an operation; rather, they address only situations where work of the same type is continued by the employer *but for which contributions to a plan which were required are no longer required.*

*Id.* at *2 (emphasis added).

Thus, a partial cessation occurs under this provision when an employer shifts from (a) work that required contributions to the pension fund to (b) work—of the same sort—that does not require contributions to the pension

13

fund. The PBGC provided examples of conduct that would generate partial withdrawal liability under Alternative (i):

> [W]here an employer bargains out of making contributions to a plan that the employer was previously required to make under a collective bargaining agreement that is otherwise in effect with respect to other requirements, or where an employer's collective bargaining obligation has ceased altogether but the employer continues to perform work of the same type which was previously covered by the agreement and for which contributions were required without the obligation to contribute to that plan ....

*Id.* at *1. Similarly, an employer would generate such liability by terminating union workers (who receive pension credits) and hiring non-union workers (who do not receive pension credits) or members of another union (who are part of a separate pension fund) for the same type of work. *See id.*; *see also Nestle Holdings, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 342 F.3d 801, 804 (7th Cir. 2003) (affirming that an employer had partial withdrawal liability when it transferred work from union employees, who received pension credits, to non-union employees, who did not receive pension credits).

In the context of transferring jobs from one physical facility to another, the PBGC explained, the employer would not be not liable for partial withdrawal if it continued to make contributions for all of the transferred work. *See* Pension Benefit Guaranty Corporation (PBGC) 83-20, 1983 WL 22426, at *1. Applying that principle, the PBGC answered the following query:

> [W]hether a partial withdrawal occurs when an employer who operates two terminals in a metropolitan area, each under a separate collective bargaining agreement requiring contributions to the same multiemployer plan, closes one but continues to perform the work of the closed terminal through the remaining metropolitan terminal and through other outlying terminals of the employer.

*Id.* The PBGC explained that "for this provision to apply the work that the employer continues to perform must be work for which contributions are not required under the plan." *Id.* This means that the employer must be continuing

14

to perform the same work—i.e., work within the jurisdiction of the CBA—but *not* contributing to the pension fund for that work. Where the work is merely shifted to another location, but remains under a plan for which the employer continues to contribute, there is no partial cessation, and no partial-withdrawal liability:

> [W]hen an employer closes one terminal and shifts the work of that terminal to other terminals which are covered by other collective bargaining agreements under which contributions are made to the plan, there is no partial cessation of the employer's contribution obligation under Section 4205(b)(2)(A)(i) on account of the shift. If, however, any of the work is shifted to a location where contributions are not required to the plan, then a partial cessation of the employer's contribution obligation will occur.

*Id.* at *2.[5]

"[T]he determination of the PBGC ... is entitled to great deference in the construction and application of ERISA." *Id.* (citing *Connolly v. Pension Benefit Guar. Corp.*, 581 F.2d 729, 730 (9th Cir. 1978)); *see also Trs. of Ironworkers Local 473 Pension Tr. v. Allied Prods. Corp.*, 872 F.2d 208, 210 n.2 (7th Cir. 1989) ("The PBGC's views are entitled to deference because of its responsibility to enforce Title IV of ERISA ...."). As it happens, I find the PBGC's reasoning persuasive, and I follow it here.[6]

CEC continues to make contributions to the Local 68 Pension Fund for all work done within the context of the remaining CBAs (Harrah's AC, Bally's AC, and Caesars AC). The parties dispute the territorial jurisdiction of the Showboat CBA, however. CEC argues that the Showboat CBA covers the engineering work at the Showboat facility. Local 68 Pension Fund argues that

---

[5] With the caveat, of course, that should a reduction in contributions amounting to 70% occur, there would be a per se partial withdrawal. *See* p. 10, *supra.*

[6] I therefore do not face the situation in which I disagreed, but felt obligated to defer to the PBGC's view "if reasonable minds could differ as to the proper interpretation of the statute." *Penn Cent. Corp. v. Western Conference of Teamsters Pension Trust Fund*, 75 F.3d 529, 534 (9th Cir. 1996) (citing *Elliot v. Carpenters' Pension Trust Fund*, 859 F.2d 808, 813 (9th Cir. 1998)).

15

the Showboat CBA covers all engineering work throughout *all* of Atlantic City, and that therefore the continuing work at Harrah's, Bally's and Caesar's falls within the jurisdiction of the Showboat CBA.

The dispute is not material. Of course, the case would be open-and-shut if the Showboat CBA applied to work at the Showboat facility alone; if so, then work done at other casinos would not fall within the jurisdiction of the Showboat CBA at all. But even assuming that engineering work throughout Atlantic City is within the jurisdiction of the Showboat CBA, CEC would still not have partial withdrawal liability. That is so because CEC's constituent members continue to contribute to the Fund for all engineering work they perform throughout Atlantic City. In such a case, the controlled group members have not "bargained out" of making contributions.

The Fund did of course experience a reduction in contributions when Showboat closed. Such a reduction would not, in itself, generate partial withdrawal liability (unless of course it exceeded 70%, which the parties agree it did not, see p. 10, *supra*). A partial withdrawal cannot be found under Alternative (i) unless the specific statutory requirements regarding continuation and transfer of work are met.[7] And they are not met here. I

---

[7] The Seventh Circuit cautioned against finding partial withdrawal merely because of a reduction in contributions. Such a ruling, it said, would impermissibly override the specific requirements of ERISA § 4205, 29 U.S.C. § 1385:

> "[A]pplication of 'broad purposes' of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action." Thus we will not override the plain language of § 1385 "in favor of the general purpose of the MPPAA and selected bits of legislative history." When Congress enacted the MPPAA, it did not merely select a broad policy goal for the courts to achieve but rather provided a comprehensive statutory scheme for the courts to enforce.... Congress has not imposed partial withdrawal liability on employers in every circumstance where a plan suffers a reduction to its contribution base; instead, Congress enacted the specific requirements of § 1385.

*Trs. of the Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Leaseway Transp. Corp.*, 76 F.3d 824, 830-31 (7th Cir. 1996) (internal citations omitted).

therefore find that the arbitrator's decision was incorrect as a matter of law on this issue. CEC is not liable for partial withdrawal liability within the meaning of Alternative **(i)**. I therefore consider Alternative **(ii)**.

### B. Alternative (ii) ("facility take-out")

The requirements of Alternative **(ii)**, a "facility-take-out," were not satisfied here. Under the Alternative **(ii)** scenario, an employer is not liable for a partial withdrawal merely because it terminates operations and ceases to make the associated contributions at one of several locations.[8] Alternative **(ii)**, like Alternative **(i)**, requires in addition that the employer continues to perform work for which contributions were previously required, but no longer contributes for that work. *See* ABA, *Employee Benefits Law* 17-22–23, *supra.* The distinction between the two Alternatives is that Alternative **(ii)** contemplates the employer's continuing to perform the work *at the same facility*.

That is not what occurred here. To be sure, the work, and the associated contributions, ceased at Showboat. CEC and its members do not, however, continue the same work, or the same kind of work, at that facility, *i.e.*, Showboat. All such work is performed at the other casinos. *A fortiori* CEC does not perform the work without making contributions; it falls under the other CEC casinos' CBAs, and they make the necessary contributions to the Fund.

\*   \*   \*

We may assume that the Showboat closing resulted in a net reduction in work. But the CEC Controlled Group continues to make contributions to the multiemployer plan, in accordance with the appropriate CBAs, for *all* of the maintenance, repair, and operation work that *is* performed under its aegis. There has been no cessation of contributions—*i.e.*, no continuation of work formerly under the CBA for which contributions are no longer made. *See* ERISA

---

[8] Again, this analysis assumes that any reduction in contributions does not surpass the 70% threshold that would establish partial withdrawal per se.

17

§ 4205(b)(2)(A)(i)-(ii), 29 U.S.C. § 1385(b)(2)(A)(i)-(ii). The arbitrator's conclusion that a partial cessation occurred by virtue of CEC's terminating work under the Showboat CBA, while similar work continued to be performed at Harrah's, Bally's, and Caesars, was therefore incorrect.

An employer does not incur partial withdrawal liability for merely ceasing or terminating one operation while continuing others—*if* the employer continues to make contributions to the pension fund for the similar work that continues to be performed. That is what happened here.

### C. Interim Payments

Since the arbitrator's decision must be vacated, the Fund shall refund the interim payments that CEC has made. *See Trustees of Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Cent. Transp., Inc.*, 935 F.2d 114, 118-19 (7th Cir. 1991) ("[F]unds will be able to repay any withdrawal liability that a court or arbitrator ultimately determines they should not have collected."); *see also* 29 C.F.R. 4219.31(d).

### D. Attorney's Fees

Per ERISA § 4301(e), 29 U.S.C. § 1451(e), a court "may award all or a portion of the costs and expenses incurred in connection with such action, including reasonable attorney's fees, to the prevailing party." This is a "flexible provision, which allows an award to either prevailing plaintiffs or prevailing defendants and leaves the decision whether to grant an award to the discretion of the district court." *Dorn's Transp., Inc. v. Teamsters Pension Tr. Fund of Phila. & Vicinity*, 799 F.2d 45, 47 (3d Cir. 1986).

The Third Circuit has held that employers are entitled to attorney's fees under this provision "only if the Plan's assessment of withdrawal liability was frivolous, unreasonable or without foundation." *Id.* at 50. I decline to find that the Fund's position was frivolous, unreasonable or without foundation. The case turned on a difficult point of statutory construction that the court was required to analyze at length. *Cf. id.* Therefore, applying the Third Circuit standard, I find that CEC is not entitled to an award of attorney's fees.

## CONCLUSION

For the foregoing reasons, CEC's motion to vacate the arbitration award is granted. The Fund must repay the interim payments that I have found were not justified. CEC is not, however, entitled to an award of attorney's fees.

An appropriate order accompanies this opinion.

Dated: June 14, 2018

_____
HON. KEVIN MCNULTY, U.S.D.J.